# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **DENNIS MAGUIRE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:13cv0335 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Dennis Maguire's applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).

For the reasons that follow, the matter will be remanded for further consideration.

**Procedural History**

Dennis Maguire (Plaintiff) applied for DIB and SSI in June 2010, claiming that he became disabled on February 1, 2003, because of heart conditions, migraine headaches, fatigue, depression, and anxiety. (Tr. at 117-18, 119-22, 142.)[1] On August 30, 2010, the Social Security Administration denied Plaintiff's claims for benefits. (Id. at 55, 56, 60-65.) Upon Plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) A. Klingemann on July 14, 2011, at which Plaintiff and a vocational expert testified. (Id. at 26-54.) On October 31, 2011, the ALJ issued a decision denying Plaintiff's claims for benefits, finding Plaintiff able to perform work as a mail clerk as it exists in significant numbers in the national economy. (Id. at 7-20.) On December 19, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Id. at 1-3.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Robin Cook, a vocational expert (VE), testified at the administrative hearing.

At the time of the hearing, Plaintiff was fifty years of age. He graduated

---

[1] Plaintiff previously filed applications for DIB and SSI benefits in December 2003, which were denied after hearing on July 11, 2008. After denial of review by the Appeals Council, Plaintiff did not pursue the applications further. (See Id. at 10.) Plaintiff does not challenge the ALJ's determination here not to reopen these previous applications.

from high school and received limited vocational training in heating and cooling. He lives with his parents.  (Id. at 31-32, 44.)

Plaintiff's Work History Report shows that Plaintiff worked as a machine set up operator for a manufacturer from 1993 to 2003.  (Id. at 167.)  Plaintiff testified that he was self-employed as a carpenter/laborer in 2007 but was unable to do the work because of his health conditions.  (Id. at 33-34.)  Plaintiff explained that he can no longer work because of his physical and mental conditions and because of his medication.  (Id.at 37.)

Plaintiff has a pacemaker and a defibrillator and must have his blood drawn every month to monitor the thinness of his blood so that his titanium aortic valve does not clog.  Plaintiff testified that his doctors at Gateway Cardiology have told him that he cannot be in any facility with an electromagnetic field.  He must monitor everything he eats and drinks, and he constantly worries about his condition.  Plaintiff testified that he is tired because of his condition and cannot lift anything over ten to fifteen pounds.  He experiences pain every day that is a three or four on a scale of one to ten but he has grown accustomed to the pain.  (Id. at. 38-39, 41, 53.)

Plaintiff testified that he sees a psychiatrist for paranoid schizophrenia and has been hearing voices since 2003.  The voices stop for periods of time but then return.  He tries to ignore the voices when they appear.  Medication helps.  (Id. at

41-43, 45-46.)

Plaintiff also testified that he is depressed, experiences crying spells, and sometimes no longer wants to be around people because he then becomes nervous. He has good days and bad days and cannot control his depressive symptoms. Plaintiff also testified that he cannot focus and has difficulty with his memory and concentration, but he can remember instructions. (Id. at 43-44, 46-47.)

Plaintiff takes numerous medications for his conditions but experiences lightheadedness, dizziness, and nausea as side effects. (Id. at 40-41, 47.)

As to his exertional ability, Plaintiff testified that he becomes very tired after walking around the block. He can sit for one hour after which he must stand and walk because his legs become numb. He gets out of breath when climbing a flight of stairs. (Id. at 42, 44.)

As to his daily activities, Plaintiff testified that he stays at home, sits on the porch, tries to help his mother prepare meals, and lies down. He becomes tired when doing chores, such as sweeping. He goes shopping with his mother at night when there are not many people in the store. His sleep is interrupted because his mind wanders; consequently, he takes short naps during the day. (Id. at 44-45, 47-48.)

Ms. Cook classified Plaintiff's past work as a self-employed odd job worker as medium and unskilled; as a hand packager as medium - heavy as performed, and

unskilled; and as a coil assembler as medium - heavy as performed, and skilled. Ms. Cook testified that Plaintiff has no skills that are transferable to any work at the sedentary level. (Id. at 52-53.)

In addition to Ms. Cook's testimony, written interrogatories answered by Delores Gonzalez, also a vocational expert, were before the ALJ. (Id. at 199-203.)

Ms. Gonzalez was asked to assume an individual of Plaintiff's age, education, and work experience and to further assume the individual to be able to perform light work except that he

> is only able to stand and/or walk for 2 hours continuously. After standing or walking for 2 hours, [he] needs to sit for at least 1/2 hour. Additionally, [he] can only perform unskilled work and can only have only [sic] frequent contact with co-workers and supervisors, and occasional contact with the public. [He] can have only minimal exposure to strong magnetic fields.

(Id. at 201.) Ms. Gonzalez responded that such a person could not perform Plaintiff's past relevant work but could perform other work in the national economy such as a mail clerk, of which 3,430 such jobs exist in the State of Missouri and 131,750 nationally. (Id. at 201-02.)

In response to a hypothetical posed by Plaintiff's counsel, Ms. Gonzalez sought clarification regarding the hypothesized limitations regarding concentration and the need to lie down. (Id. at 214-15, 217-18.) A review of the record shows no clarification to have been provided; the hypothetical remained unanswered.

# Medical Evidence Before the ALJ[2]

A review of the record in its entirety shows that Plaintiff underwent mechanical aortic valve replacement in 2003, after which he went into sudden cardiac arrest. As a result of this event, an automatic implantable cardioverter defibrillator (AICD or ICD)[3] was implanted on November 17, 2003. (*See* Tr. 328.)

Plaintiff visited Dr. Tammam Al-Joundi at Gateway Cardiology on January 10, 2008, for follow up of his conditions of aortic stenosis, status post aortic valve replacement, ventricular arrhythmias, and status post AICD placement. Dr. Al-Joundi noted Plaintiff to be doing well but with occasional episodes of chest discomfort that Plaintiff attributed to anxiety. Dr. Al-Joundi noted Plaintiff's medical history to include a diagnosis of schizophrenia. Plaintiff's current medications included Coumadin, Toprol, Risperdal, and Seroquel. Physical examination showed grade II/VI systolic murmur, but was otherwise unremarkable. Dr. Al-Joundi diagnosed Plaintiff with chest pain, status post aortic valve replacement, ventricular arrhythmias, status post AICD placement,

---

[2] Because the Commissioner's final decision on Plaintiff's previous applications for benefits was entered on July 11, 2008, and the decision was not reopened, Plaintiff's current claims of disability can only be considered as of the effective date of this prior adverse decision. <u>See</u> <u>**Lynn v. Bowen**</u>, 702 F. Supp. 768, 771-72 (W.D. Mo. 1988). As such, despite there being narrative reports that Plaintiff's impairments dated from 2003, the only medical evidence in the administrative record on Plaintiff's current applications begins with treatment rendered to Plaintiff in January 2008.

[3] *See* <u>What is an Implantable Cardioverter Defibrillator?</u>, *National Institutes of Health: National Heart, Lung, & Blood Institute* (Nov. 9, 2011), *available at* <<u>http://www.nhlbi.nih.gov/health/</u> health-topics/topics/icd/>.

hypertension-well controlled, hyperlipidemia, and schizoaffective disorder. Diagnostic testing was ordered. (<u>Id.</u> at 226-27.)

Plaintiff visited Dr. Mohinder Partap at Psych Care Consultants on March 10, 2008, who noted that he last saw Plaintiff in October 2007. Plaintiff reported being out of medication for some months, having lost insurance coverage. Plaintiff reported having poor sleep and having visual hallucinations of shadows of people standing behind him and crawling on the floor. Dr. Partap noted Plaintiff to be rational and to have an appropriate appearance, but that he was anxious. Plaintiff was diagnosed with schizophrenia and was prescribed Risperdal. He was to return in one month. (<u>Id.</u> at 360.)

Plaintiff visited Dr. Sam Hawatmeh on May 20, 2008, who noted Plaintiff's conditions to include aortic valve endocarditis, status post valve replacement October 2003, for which Plaintiff was chronically taking Coumadin; ventricular arrhythmia, status post pacemaker and ICD; hypertension; and schizophrenia, for which Plaintiff saw Dr. Partap. Dr. Hawatmeh emphasized to Plaintiff the need to keep all of his appointments given his multiple medical problems. Medication was prescribed. (<u>Id.</u> at 342.)[4]

Plaintiff returned to Gateway Cardiology on May 28, 2008, and visited Dr.

---

[4] A review of the record shows that Plaintiff regularly visited Dr. Hawatmeh through June 2010 for general follow up. (Tr. 343-52.) During these visits, Dr. Hawatmeh continued in his diagnoses, ordered laboratory testing to measure blood levels, and instructed Plaintiff to follow up with his cardiologist and psychiatrist. The details of these visits are not separately set out in

Liwa T. Younis who noted Plaintiff to have recently been to the emergency room with multiple shocks and in atrial fibrillation. Plaintiff reported not having any significant chest pain, discomfort, heaviness, or tightness since his treatment in the emergency room. He had occasional insomnia. Plaintiff reported not having taken Digoxin for three weeks. Plaintiff's current medications included Metoprolol and Coumadin. Physical examination showed grade II/VI soft systolic murmur, but was otherwise essentially unremarkable. Plaintiff was prescribed Toprol and Digoxin, and diagnostic testing was ordered. Noting that the AICD had reached the end of its life, arrangements were made for replacement. (Id. at 228-29.)

Plaintiff underwent a myocardial perfusion stress test on June 5, 2008, the results of which were normal; however, premature atrial contractions were noted during the testing. (Id. at 309-11.)

Plaintiff visited Dr. Partap on June 9, 2008, and reported having poor sleep, explaining that he wakes in the middle of the night hearing his name but no one is around. Plaintiff also described seeing shadows and being paranoid about someone being behind him. Dr. Partap noted Plaintiff was anxious and worried. Plaintiff was continued on Risperdal and was to return in one month. (Id. at 360.)

On June 13, 2008, Plaintiff underwent surgery for replacement of his ICD. Dr. Al-Joundi noted that the original ICD was placed on November 17, 2003, for

this Court's summary of the medical evidence.

sudden cardiac arrest following aortic valve surgery. Plaintiff was discharged on June 16, 2008. (Id. at 288, 328-29.)

Plaintiff returned to Dr. Al-Joundi on July 15, 2008, who noted Plaintiff to have had a recurrence of palpitations, which caused Plaintiff to be anxious and uptight. Plaintiff was prescribed Amiodarone, and possible ablation was discussed. Dr. Al-Joundi noted Plaintiff to be under significant stress because of his unemployment status and that he was denied disability "although he has a serious cardiac illness." Dr. Al-Joundi advised that Amiodarone was not a good therapeutic choice because of its side effects and cautioned Plaintiff as to recurrent palpitations with Amiodarone withdrawal. Hospitalization to begin Solatol therapy in lieu of Amiodarone was discussed. (Id. at 230-31.)

On July 18, 2008, Dr. Al-Joundi completed a Cardiac RFC Questionnaire in which he reported Plaintiff's diagnoses to be bacterial endocarditis status post metallic aortic valve replacement; ventricular tachycardia; sudden cardiac arrest status post AICD; hypertension; hyperlipidemia; atrial tachycardia; and atrial fibrillation. Plaintiff's symptoms included fatigue, weakness, palpitations, dizziness, and occasional shortness of breath. Dr. Al-Joundi reported that stress could aggravate Plaintiff's arrhythmias, causing device intervention with possible shocks, and opined that Plaintiff should avoid all but low stress situations. Dr. Al-Joundi also reported that Plaintiff's physical health problems caused him to be

depressed regarding his physical disability to pursue a normal, healthy life. He opined that Plaintiff's preoccupation with his condition contributed to the severity of his complaints and interfered with his concentration. Dr. Al-Joundi reported dizziness, lightheadedness, and bleeding to be side effects of Plaintiff's medications. Dr. Al-Joundi described Plaintiff's prognosis as guarded. Dr. Al-Joundi further opined that Plaintiff could walk two city blocks without rest or severe pain, could stand and walk less than two hours in an eight-hour workday, could sit at least six hours in an eight-hour workday, would need to lie down during the workday, could frequently lift and carry ten pounds, could occasionally lift and carry twenty pounds, and could occasionally bend and twist. (Id. at 222-25.)

Plaintiff was admitted to Des Peres Hospital on August 4, 2008, for inpatient treatment of paroxysmal atrial fibrillation with frequent episodes of rapid ventricular response. His previous medication for the condition was discontinued because of side effects; Sotalol therapy was begun. Plaintiff was admitted so that he could be monitored for side effects. Dr. Nizar Assi noted that Plaintiff underwent unsuccessful ablation for the condition and continued to be symptomatic. It was also noted that Plaintiff had a permanent pacemaker implanted for sick sinus syndrome (SSS). Plaintiff was discharged on August 7 with instruction to continue with Sotalol, Metroprolol, Coumadin, Digoxin, and

TriCor.  (Id. at 324-27.)

On August 21, 2008, Plaintiff visited Dr. Younis at Gateway Cardiology.  It was noted that Plaintiff was recently started on Sotalol to control his supraventricular arrhythmias.  Plaintiff reported doing well and denied any significant chest pain, palpitation, fluttering, or syncope.  He further reported having dyspnea with exertion, visual changes, ringing in the ear, frequent urination, memory loss, depression, anxiety, and easy bruising.  It was noted that Plaintiff had an upcoming procedure scheduled to assess the AICD device.  Physical examination showed soft systolic murmur, but was otherwise normal.  EKG testing performed that same date showed a normal sinus rhythm, left ventricle hypertrophy, and T-wave changes.  Dr. Younis noted Plaintiff had not tolerated his prescribed medication for dyslipidemia because of aches and pains; Rowasa was prescribed.  (Id. at 335-36.)

Plaintiff returned to Dr. Partap on October 6, 2008, and requested to see a therapist.  Plaintiff reported he had stopped taking his medications after having a relapse of delusions and hallucinations, particularly hallucinations of seeing bright lights and hearing voices.  He was paranoid around people.  Dr. Partap noted Plaintiff to be argumentative and to have no insight.  (Id. at 360.)

On October 23, 2008, Plaintiff visited Michael Stephen Logue. A family nurse practitioner, at Gateway Cardiology for follow up.  Plaintiff reported having

no chest discomfort, palpitations, dizziness, or memory loss. Mr. Logue determined Plaintiff's conditions were stable with the current therapy and instructed Plaintiff to return in six months. (Id. at 322-23.)

Plaintiff visited Dr. Partap on November 3, 2008, reporting having raced out of a family reunion because of panic. Plaintiff reported having poor sleep, being paranoid at night, hearing voices, and seeing shadows out of the corner of his eye. Plaintiff was noted to be anxious as he described his symptoms. Dr. Partap increased Plaintiff's dosage of Risperdal and prescribed benztropine. (Id. at 359.)

Plaintiff was admitted to St. Alexius Hospital on November 4, 2008, for stabilization of low INR[5] levels. Plaintiff was discharged on November 8 in stable condition and instructed on administering Lovenox injections at home. (Id. at 235-46.)

On December 3, 2008, Plaintiff reported to Dr. Partap that his hallucinations had lessened some. Plaintiff reported having seen a bright light in the sky – determined by Dr. Partap to be a hallucination – after which he blacked out for eight hours. Plaintiff reported being in better control of himself and having brief episodes of anxiety. He was continued on Risperdal and benztropine and was prescribed Diazepam. (Id. at 359.)

---

[5] "International normalized ratio" is used to monitor the effectiveness of anticoagulant medications and to measure the thinness of the blood. Lab Tests Online, *American Ass'n for Clinical Chemistry* (last modified Jan. 25, 2014), *available at* <http://labtestsonline.org/ understanding/analytes/pt/tab/test>.

Plaintiff underwent an echocardiogram on January 13, 2009, the results of which showed normal left and right ventricular function; left ventricular hypertrophy; dilated aortic root; mild mitral and tricuspid regurgitation; mild pulmonary hypertension; mild pulmonic insufficiency; and normal functioning of the mechanical aortic valve. (Id. at 334.) Plaintiff visited Dr. Assi at Gateway Cardiology that same date and reported that he was doing well and had no atypical chest or musculoskeletal pain, shortness of breath, or palpitations. Plaintiff reported that he no longer took vitamin supplements or cholesterol medications because of their interaction with Coumadin. Plaintiff also reported that he had stopped taking TriCor several months earlier because of associated achiness. Physical examination showed systolic ejection murmur but was otherwise normal. Dr. Assi noted there to be no signs or symptoms of congestive heart failure. Plaintiff was continued on his current therapy. (Id. at 332-33.)

On April 1, 2009, Plaintiff visited Dr. Al-Joundi at Gateway Cardiology for follow up of valve surgery, atrial fibrillation, and cardiomyopathy. Plaintiff reported having no palpitations or chest discomfort suggestive of ischemia. Plaintiff complained of fatigue. Plaintiff's history was noted to include ventricular tachycardia with cardiac defibrillator placement in 2003; atrial fibrillation; SSS; bacterial endocarditis, with mechanical aortic valve replacement in October 2003; moderate TR; dyslipidemia; and hypertension. Plaintiff's current medications

included Lovaza, Sotalol, Digoxin, and Metoprolol. Physical examination showed systolic ejection murmur, but was otherwise unremarkable. Dr. Al-Joundi noted Plaintiff to be obese. Plaintiff's mechanical devices were noted to be functioning normally and maintaining sinus rhythm. (Id. at 340-41.)

Plaintiff returned to Dr. Partap on April 29, 2009, and reported that he had auditory hallucinations in that he hears dead parents[6] talking to him and yells back to them. Plaintiff reported having visual hallucinations in that he sees movement of things that he stares at. Dr. Partap noted Plaintiff to be nervous and depressed. Plaintiff requested to resume his medications; Risperidone, benztropine, and Diazepam were prescribed. (Tr. 359.)

On June 25, 2009, Plaintiff reported to Dr. Partap that Risperidone helped some, but that he continued to have auditory hallucinations of being called. Plaintiff denied having visual hallucinations. Plaintiff reported his sleep was fair. Dr. Partap noted Plaintiff's appearance and affect to be unremarkable. Plaintiff was continued on his current medications.

Plaintiff returned to Dr. Younis on July 22, 2009, reporting that he felt palpitations at night and was exhausted and tired. Plaintiff also reported being irritable and lethargic. Plaintiff denied having any chest pain or shortness of breath. Plaintiff's medications included Lovaza, Sotalol, Digoxin, Metoprolol, and

---

[6] There is no explanation of why Plaintiff would describe the parents with whom he was living in

Coumadin. Physical examination showed no change. Dr. Younis opined that Plaintiff's fatigue and malaise were caused by Plaintiff's medications, deconditioning, and depression. Plaintiff's medications were adjusted, and he was instructed to exercise. (Id. at 318-19.)

Results of Holter monitor testing in July 2009 showed paroxysmal atrial fibrillation with paced rhythm. (Id. at 321.)

On July 31, 2009, Plaintiff reported to Dr. Partap that he had visual hallucinations of cat and bird shadows in the house and of a round light rolling by. He also had a vague sense of hearing voices. Plaintiff further reported feeling paranoid around people and feeling that he was being watched. Dr. Partap described Plaintiff as anxious. He increased Plaintiff's dosage of Risperidone and Diazepam and instructed him to continue with his other medication. (Id. at 358.)

Plaintiff visited Dr. Partap on September 3, 2009, and reported not being approved for disability. Plaintiff denied having auditory or visual hallucinations, but reported that he felt as though he was being watched from behind. He was paranoid and did not want to be around people. Plaintiff was continued on his medications. (Id.)

Plaintiff returned to Dr. Younis on September 16, 2009, and reported having palpitations, occasional chest pain, mild to moderate exertional dyspnea with

June 2011 as dead.

activities, and moderate anxiety.  It was noted that Plaintiff walked or biked three to four times a week.  He was compliant with his medications, which included Niaspan, Diazepam, Risperidone, TriCor, Metoprolol, Sotalol, Digoxin, and Coumadin.  Physical examination showed no change.  Plaintiff had no signs or symptoms of congestive heart failure, and his paroxysmal atrial fibrillation was noted to be improved.  Dr. Younis adjusted Plaintiff's medications due to fatigue and tiredness.  (Id. at 316-17.)

Plaintiff underwent a stress echocardiogram on October 14, 2009.  Plaintiff experienced no chest pain suggestive of ischemia; but, arrhythmias were noted, including atrial fibrillation.  (Id. at 315.)

Plaintiff reported to Dr. Partap on November 4, 2009, that he had learned to ignore his delusions and hallucinations.  Plaintiff further reported that he spends his day working around the house and that he is at his parents' home most of the time.  Plaintiff was continued on his medications.  (Id. at 357.)

Dr. Assi saw Plaintiff on November 18, 2009, noting that laboratory testing showed Plaintiff's INR to be very high.  Dr. Assi also noted that a recent stress test showed Plaintiff to have an excessive heart rate response, causing the test to be terminated early.  Plaintiff reported having occasional dizziness with position change and dyspnea on exertion.  Plaintiff reported that he had stopped taking TriCor because it caused myalgia and that he had lowered his dosage of

Metoprolol and Sotalol because of fatigue. He had had no palpitations or chest discomfort suggestive of ischemia. Physical examination showed obesity and systolic murmur, but was otherwise unremarkable. Dr. Assi noted Plaintiff's mechanical devices to be functioning normally. Plaintiff was diagnosed with paroxysmal supraventricular tachycardia (PSVT)-frequent episodes, and an adjustment to medication was discussed. As to Plaintiff's aortic valve replacement, Dr. Assi noted a recent echocardiography to show no evidence of significant aortic insufficiency. Plaintiff was noted not to be taking medication for hyperlipidemia, and vitamin D was recommended. Dr. Assi opined that Plaintiff's fatigue and malaise was secondary to his medications. (Id. at 338-39.)

Plaintiff was admitted to Des Peres Hospital on November 30, 2009, for initiation of new antiarrhythmic therapy. Dr. Assi noted that Plaintiff was intolerant of multiple medications, including statins and fibrates due to myalgias. Plaintiff reported not being consistently compliant with his medications because of concerns regarding erectile dysfunction. He also reported exertional dyspnea, fatigue, and myalgias. Plaintiff tolerated his transition to Multaq and was discharged on December 2, 2009. (Id. at 258-62.)

Plaintiff visited Dr. Partap on February 2, 2010. He reported that he experiences vague auditory hallucinations when watching television in that he hears voices calling him ugly and fat; he sees shadows brought on by the stress of

- 17 -

crowds; and he is insecure when he is alone. Dr. Partap described Plaintiff as anxious and nervous. Plaintiff was instructed to continue with Risperidone. (Id. at 357.)

Plaintiff underwent an echocardiogram on February 22, 2010, for evaluation of his congestive heart failure, hypertension, and hyperlipidemia. Results showed normal left and right ventricular function; mild mitral and tricuspid regurgitation; mild pulmonary hypertension; and mitral annulus calcification. (Id. at 337.)

Plaintiff reported no complaints to Dr. Partap on March 5, 2010, but continued to report auditory hallucinations precipitated by watching television. He spent his days at home, but was pushing himself to go out. Plaintiff denied any visual hallucinations. Plaintiff reported that he could feel some improvement. Dr. Partap noted Plaintiff to be anxious and compliant with his medications. Dr. Partap continued Plaintiff on his current medications and encouraged him to go out walking one hour a day. (Id. at 357.)

Plaintiff returned to Dr. Partap on April 8, 2010, and reported that his hallucinations were minimal and his sleep was fair. He had improved, but continued to not like being around people. Dr. Partap noted Plaintiff's speech and self-confidence were much improved with treatment. Plaintiff's appearance and affect were unremarkable. Plaintiff was continued on his medications. (Id. at 356.)

On May 7, 2010, Dr. Partap described Plaintiff as not having any substantial psychiatric complaints. Plaintiff reported that he slept well and was spending the day around the house doing chores. Plaintiff was continued on his medications. (Id.)

Plaintiff visited Dr. Younis on May 10, 2010, reporting increased fatigue and tiredness, irritability, and being discouraged to exercise because of fatigue. It was noted that Plaintiff's AICD discharged two weeks prior. Plaintiff explained that he wanted to participate in cardiac rehabilitation but could not afford the co-payment. Plaintiff reported having chest pain, dyspnea on exertion, shortness of breath, and palpitations. Physical examination was unchanged. Dr. Younis noted that Plaintiff was somewhat compliant with his medications and that he could not tolerate Multaq. Dr. Younis also noted Plaintiff to be intolerant of statin therapy for hyperlipidemia because of myalgias. Plaintiff was instructed to continue with Metoprolol, Sotalol, Digoxin, Coumadin, and beta blocker. (Id. at 312-14.)

On June 7, 2010, Plaintiff informed Dr. Partap that he had no complaints. He was sleeping well and had no auditory or visual hallucinations on his regular medications. Plaintiff reported that he spent the day around the house doing chores and watching television. He could go places, but continued to be uncomfortable in crowds, feeling as though he was being watched. Dr. Partap noted Plaintiff was relaxed and talkative. Dr. Partap continued Plaintiff on his current medications

and assigned a Global Assessment of Functioning (GAF) score of 40.[7]  (Id. at 356.)

On June 18, 2010, Dr. Al-Joundi completed a Cardiac RFC Questionnaire, listing Plaintiff's diagnoses as bacterial endocarditis status post aortic valve replacement, ventricular tachycardia, cardiac arrest, hypertension, and NYHA class I/II.[8]  Dr. Al-Joundi described Plaintiff's symptoms as fatigue, weakness, palpitations, dizziness, and occasional shortness of breath.  Dr. Al-Joundi opined that Plaintiff had marked limitations of ordinary physical activity as shown by fatigue, palpitation, dyspnea, or anginal discomfort.  Dr. Al-Joundi reported that stress could aggravate Plaintiff's arrhythmias, causing device intervention with possible shocks, and opined that Plaintiff was capable of low stress jobs.  Dr. Al-Joundi also reported that Plaintiff's physical health problems caused him to be depressed regarding his physical disability to pursue a normal, healthy life and that emotional factors contributed to the severity of Plaintiff's complaints and functional limitations.  Dr. Al-Joundi reported that Plaintiff frequently experienced cardiac symptoms (including psychological preoccupation with the condition)

---

[7] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).

[8] New York Heart Association classification – stages of heart failure; class I, mild; class II, mild; having no to slight limitation in physical activity with fatigue, palpitation, or dyspnea resulting from ordinary physical activity.  See Questions About HF, Heart Failure Soc'y of America (last modified Dec. 5, 2011), available at <http://www.abouthf.org/questions_stages.htm>.

severe enough to interfere with attention and concentration. Dizziness, lightheadedness, and bleeding were side effects of Plaintiff's medications. Plaintiff's prognosis was guarded. Dr. Al-Joundi opined that Plaintiff could walk two city blocks without rest, could stand for thirty to forty-five minutes at one time before needing to sit or walk around, and could sit at one time for more than two hours before needing to stand. Plaintiff should avoid all exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Al-Joundi opined that Plaintiff was unable to work. (Id. at 366-71.)

Plaintiff returned to Dr. Partap on July 9, 2010, and had no complaints. Plaintiff denied having any auditory or visual hallucinations but continued to report paranoia in crowds. Plaintiff reported that he scans the street a lot. He does household chores during the day but tires easily. He was not happy with life. Dr. Partap again rated Plaintiff's GAF score as 40 and instructed Plaintiff to continue with his medications. (Id. at 395.)

Plaintiff visited Dr. Al-Joundi on August 17, 2010, complaining of occasional palpitations. Plaintiff reported that no aggravating factors brought on the palpitations, and nothing relieved them. Physical examination showed systolic ejection murmur but was otherwise unremarkable. Dr. Al-Joundi noted Plaintiff to be asymptomatic with respect to his aortic valve replacement and to be status post

radio frequency ablation with respect to his PSVT with no recurrences. Dr. Al-Joundi also noted there had been no recurrences of ventricular tachycardia. Plaintiff was continued on his current therapy. (Id. at 407-09.)

On August 24, 2010, Dr. Robert Hughes, a medical consultant with disability determinations, completed a Physical RFC Assessment of Plaintiff. He opined that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand and/or walk a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. He had an unlimited ability to push and/or pull. Dr. Hughes further opined that Plaintiff should never climb ladders, ropes, and scaffolds; could occasionally climb ramps and stairs; and could frequently balance, stoop, kneel, crouch, and crawl. Plaintiff had no manipulative, visual, or communicative limitations. With respect to environmental limitations, Dr. Hughes opined that Plaintiff should avoid concentrated exposure to extreme cold and hazards, but otherwise was not limited. (Id. at 373-78.)

On August 27, 2010, Sherry Bassi, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that Plaintiff's schizophrenia and bipolar/schizoaffective mood problems resulted in moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; mild limitations in activities of

daily living; and one or two repeated episodes of decompensation of extended duration.  (Id. at 382-92.)

In a Mental RFC Assessment completed that same date, Dr. Bassi opined that, in the domain of Understanding and Memory, Plaintiff was not significantly limited in his abilities to (a) remember locations and work-like procedures and (b) understand and remember very short and simple instructions.  He was moderately limited in his ability to understand and remember detailed instructions.  In the domain of Sustained Concentration and Persistence, Plaintiff was not significantly limited in his abilities to carry out very short and simple instructions and to make simple work-related decisions.  He was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  In the domain of Social Interaction, Plaintiff was moderately limited in his ability to interact appropriately with the general public, but was otherwise not significantly limited. Finally, in the domain of Adaptation, Plaintiff had no significant limitations in his ability to be aware of normal hazards and take appropriate precautions, but was moderately limited in his abilities to respond appropriately to changes in the work

setting, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. Dr. Bassi concluded that Plaintiff could follow simple directions and make basic work-related decisions, relate adequately to peers and supervisors, and could adapt to routine changes in his work environment. (Id. at 379-81.)

On September 10, 2010, Plaintiff reported to Dr. Partap that he had auditory hallucinations of voices and visual hallucinations of shadows of people. Plaintiff reported having erratic sleep and waking up tired. He was paranoid around people and wanted to stay at home. He went to the store at night. Dr. Partap noted Plaintiff was worried and depressed. Plaintiff was continued on his current medications. (Id. at 395.)

Plaintiff returned to Dr. Partap on October 12, 2010, and reported that he can ignore the hallucinations. He was not sleeping well and was going shopping at night when there were few people. Dr. Partap continued Plaintiff on his medications and additionally prescribed Temazepam. (Id.)

On November 9, 2010, Plaintiff reported to Dr. Partap that he had brief periods of depression. He was having auditory hallucinations of clearly hearing his name when no one was around. He was learning to ignore the hallucinations. Plaintiff also reported having visual hallucinations of seeing vague moving black things and feeling compelled to investigate. Dr. Partap noted Plaintiff was

anxious. Plaintiff was continued on his medications. (Id. at 394.)

An echocardiogram performed February 23, 2011, showed normal left and right ventricular function; left atrial enlargement and left ventricular hypertrophy; mitral annulus calcification; mild mitral and tricuspid regurgitation; mild pulmonary hypertension; and mild pulmonic insufficiency. (Id. at 406.) Plaintiff visited Dr. Al-Joundi that same date and complained of chronic palpitations, relieved with beta blockers. Plaintiff reported having no chest pain or dizziness, but did complain of joint pain, bone pain, and myalgia. Physical examination was unremarkable. Plaintiff was continued on his current therapy. (Id. at 404-05.)

On March 21, 2011, Plaintiff reported to Dr. Partap that he continued to have auditory and visual hallucinations, but could ignore them with medication. (Id. at 394.)

On April 18, 2011, Dr. Partap completed a Mental RFC Questionnaire in which he reported that he had treated Plaintiff since March 2004 and that Plaintiff suffered from paranoid schizophrenia. Dr. Partap reported Plaintiff's current GAF score was 40, as was his highest GAF score within the past year. Dr. Partap reported his clinical findings of Plaintiff's mental impairments to be paranoia as well as auditory and visual hallucinations. He opined that Plaintiff had serious limitations in his mental abilities and aptitudes to do unskilled, semi-skilled, and skilled work but that his limitations did not preclude work. He further opined that

Plaintiff was unable to meet competitive standards in jobs requiring him to interact appropriately with the general public and to maintain socially appropriate behavior, but otherwise was no more than seriously limited in his mental abilities and aptitudes to do particular types of jobs. Dr. Partap reported that Plaintiff's psychiatric condition did not exacerbate Plaintiff's physical symptoms. (Id. at 398-403.)

Plaintiff reported to Dr. Partap on June 24, 2011, that his hallucinations were less troublesome. His sleep was fair to poor. Plaintiff reported that he lives on his own and with his parents. He could go out for his needs when the stores were not crowded. Dr. Partap described Plaintiff's attitude and affect as good. Plaintiff was continued on his medications. (Id. at 411.)

In a statement dated June 28, 2011, Dr. Al-Joundi set out Plaintiff's diagnoses and opined that Plaintiff was severely disabled and that physical and mental stress aggravated his symptoms. Dr. Al-Joundi reported that Plaintiff could stand for less than two hours at one time; could walk for less than two hours at one time; and could occasionally lift ten to twenty pounds. He did not specify the amount of time Plaintiff could sit. Dr. Al-Joundi reported that Plaintiff's physical disability and limitations made him anxious and depressed. (Id. at 410.)

### The ALJ's Decision

The ALJ found Plaintiff to meet the insured status requirements of the Social

Security Act through December 31, 2009, and not to engaged in substantial gainful activity since February 1, 2003, the alleged onset date of disability. The ALJ further found Plaintiff's tachycardia and schizophrenia to be severe impairments, but concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Id. at 12-14.)

The ALJ found Plaintiff to have the RFC to perform light work[9] except that he was

> only able to stand and/or walk for 2 hours continuously. After standing or walking for 2 hours, [Plaintiff] needs to sit for at least 1/2 hour. Additionally, [he] can only perform unskilled work and can only have frequent contact with co-workers and supervisors, and occasional contact with the public. [Plaintiff] can have only minimal exposure to strong magnetic fields.

(Id. at 14.) With this RFC, Plaintiff was unable to perform any of his past relevant work. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that Plaintiff could perform other work existing in significant numbers in the national economy, specifically, that of a mail clerk. Thus, Plaintiff was not under a disability from February 1, 2003, through the date of the decision. (Id. at 18-20.)

---

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

## Discussion

To be eligible for DIB and SSI under the Social Security Act, Plaintiff must prove that he is disabled.  **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning

that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal

quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. Plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of Plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. **Pearsall**, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**, 315 F.3d 974, 977 (8th Cir. 2003).

In this cause, Plaintiff challenges the manner and method by which the ALJ determined his RFC, arguing that no medical evidence supports the RFC determination and, further, that the ALJ improperly weighed the medical opinions of his treating physicians and failed to cite sufficient medical evidence to support the RFC conclusion. Plaintiff also claims that the ALJ erred in her analysis finding Plaintiff's subjective complaints not to be credible. For the following reasons, the matter will be remanded for further consideration.

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency, and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and any functional restrictions. **Polaski v. Heckler**, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective

complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012); **Cline v. Sullivan**, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." **Id.** See also **Renstrom**, 680 F.3d at 1066; **Beckley v. Apfel**, 152 F.3d 1056, 1059-60 (8th Cir. 1998). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." **Renstrom**, 680 F.3d at 1066 (internal quotation marks and citation omitted) (alteration in *Renstrom*).

Here, the ALJ stated only that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with her RFC assessment. The ALJ then set out the objective medical evidence of record, weighed the medical opinion evidence of record, and concluded with her RFC findings. (See Tr. at 15-18.) The ALJ did not set out the inconsistencies she relied upon to find Plaintiff's subjective complaints not credible and, indeed, failed to mention or discuss any of the *Polaski* factors despite there being evidence on the record of each factor. "This error alone requires reversal." **Erickson v. Sullivan**, 930 F.2d 654, 656 (8th Cir. 1991). See also **Jeffery v. Secretary of Health & Human Servs.**, 849 F.2d 1129, 1133 (8th

Cir. 1988) (ALJ's failure to identify specific evidence to discredit subjective complaints does not comply with *Polaski*); **Douthit v. Bowen**, 821 F.2d 508, 509-10 (8th Cir. 1987).

The Commissioner appears to argue that the ALJ's narrative summary of the medical evidence and RFC findings contains reasons sufficient to discredit Plaintiff's subjective complaints. A review of the ALJ's decision, however, shows that to the extent the ALJ set out reasons to discount Plaintiff's subjective complaints, such reasons appear to be based on the objective medical evidence without consideration of the *Polaski* factors. This is improper. See **O'Donnell v. Barnhart**, 318 F.3d 811, 816-17 (8th Cir. 2003). To the extent the Commissioner argues that the ALJ's summary of the medical evidence nevertheless touched upon the *Polaski* factors, her contention that such summary was sufficient to discredit Plaintiff's complaints is without merit.

With respect to Plaintiff's physical impairments, the only *Polaski* factor arguably alluded to by the ALJ was that relating to side effects of medications, and specifically, that Plaintiff was not compliant with his medications "due to concerns that they were causing erectile dysfunction" and that such noncompliance "suggests that his impairments were not as limiting as alleged." (Tr. at 16, 17.) A review of the record as a whole, however, shows Plaintiff to have reported, and his physicians to find, that he experienced multiple adverse side effects from his

medications, including aches and pains, myalgia, adverse interactions with other medications, and fatigue and malaise. The record further shows that Plaintiff's purported noncompliance with his medications was on account of such adverse side effects. Indeed, the treatment notes from Plaintiff's treating physicians include repeated entries that Plaintiff could not tolerate certain medications because of adverse side effects, that Plaintiff's medications were adjusted because of his fatigue and malaise, that replacement medication therapies were instituted and prescribed because of adverse side effects from current medications, and that some replacement therapies themselves caused adverse side effects. See **O'Donnell**, 318 F.3d at 819 (ALJ erred in credibility determination by failing to consider claimant's reasons to discontinue medication or therapies, including adverse side effects); **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996) (finding ALJ's credibility analysis to be flawed where ALJ relied on claimant's discontinuation of medication without examining documented reasons for such discontinuation); **Kirby v. Sullivan**, 923 F.2d 1323, 1327-28 (8th Cir. 1991) (holding that, before discrediting subjective complaints on account of noncompliance, ALJ should examine underlying reasons for noncompliance, including medication side effects). See also **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997) (requiring ALJ to consider medication side effects in credibility analysis and to include credible side effects in hypothetical question to vocational

expert).

With respect to Plaintiff's mental impairment, the ALJ again alluded to Plaintiff's noncompliance with his treatment regimen, finding Plaintiff to have periodically delayed in returning to Dr. Partap for follow up treatment and occasionally relapsed in taking medication. (Tr. at 17-18.) The Eighth Circuit Court of Appeals has repeatedly recognized, however, that a mentally ill claimant's noncompliance with treatment can be the result of the mental impairment itself and cannot, with nothing more, be deemed willful or unjustifiable to such an extent that the claimant's subjective complaints relating thereto should be discredited. See **Pate-Fires v. Astrue**, 564 F.3d 935, 945-57 (8th Cir. 2009) (and cases cited therein).

To the extent the ALJ further found that Plaintiff's mental impairment was "well-controlled" with medication, a review of the record shows that even with regularly managed treatment, Plaintiff continued to experience auditory and visual hallucinations, delusions, and paranoia. (Tr. at 18.) While Plaintiff reported on isolated occasions that he could "ignore" his hallucinations with the help of medication, the record nevertheless shows that Dr. Partap continually adjusted Plaintiff's psychotropic medications on account of his continued symptoms and that Plaintiff significantly altered his behavior because of such manifestations by staying at home during the day and going to stores only at night when there were

fewer people around.  Cf. **Andler v. Chater**, 100 F.3d 1389, 1393 (8th Cir. 1996) (noting Regulations' recognition that individuals with chronic psychotic disorders commonly structure their lives in such a way as to minimize stress and reduce their signs and symptoms) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)). Although evidence shows Plaintiff's condition to have deteriorated when he ran out of psychotropic medications or was not taking his medications as prescribed, substantial evidence nevertheless shows that Plaintiff continued to suffer from and exhibit significant symptoms of his mental impairment when he was compliant with medication.  Indeed, Dr. Partap noted the presence of such symptoms even when Plaintiff reported improvement in his condition and to have no complaints.

The ALJ appears to have relied on Plaintiff's limited period of improvement in 2010 to find his mental impairment to be "well-controlled."  The Court notes, however, that recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation.  See **Rowland v. Astrue**, 673 F. Supp. 2d 902, 920-21 (D.S.D. 2009) (citing Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)).  As noted by the Eighth Circuit, "[i]t is inherent in psychotic illnesses that periods of remission will occur[.] . . . Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." **Andler**, 100 F.3d at 1393 (internal quotation marks and citations omitted).  Given that a claimant's level of mental functioning may seem relatively adequate at a specific

time, proper evaluation of the impairment must take into account a claimant's level of functioning "over time." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(2).

Because the longitudinal picture of Plaintiff's mental impairment here shows him to have continued to exhibit symptoms of psychotic illness even through periods of regular treatment, it cannot be said that the ALJ's finding that Plaintiff's impairment was "well-controlled" with medication is supported by substantial evidence on the record as a whole or would constitute a sufficient basis upon which to discredit Plaintiff's subjective complaints.

Accordingly, this matter must be remanded for an appropriate analysis of Plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski.* See **Butler v. Secretary of Health & Human Servs.**, 850 F.2d 425, 428-29 (8th Cir. 1988).

Because "[s]ubjective complaints . . . are often central to a determination of a claimant's RFC," **Fredrickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004), an ALJ's RFC assessment based on a faulty credibility determination is called into question because it does not include all of the claimant's limitations, **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001). This is especially true here where the ALJ failed to properly consider evidence of Plaintiff's mental impairment. See **Pate-Fires**, 564 F.3d at 944-45 (ALJ's failure to properly evaluate evidence of mental impairment resulted in RFC not supported by

substantial evidence); cf. **Delrosa v. Sullivan**, 922 F.2d 480, 485-86 (8th Cir. 1991) (failure to properly consider mental impairment may have resulted in credibility analysis that failed to examine possibility that impairment aggravated claimant's sense of pain).

Additionally, the ALJ discounted the medical opinions of Plaintiff's treating physicians, Drs. Al-Joundi and Partap, because of Plaintiff's purported noncompliance with medications, "well-controlled" mental impairment, and inconsistent mental symptoms. (Tr. at 17, 18.) As discussed above, these findings are not supported by substantial evidence on the record as a whole and therefore do not constitute good reasons to discount the opinions. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (requiring ALJ give good reasons for the weight accorded to treating physicians' opinions).[10] Because the reasons given by the ALJ are insufficient to discount the medical opinions of Plaintiff's treating physicians, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. See generally **Leckenby v. Astrue**, 487 F.3d 626 (8th Cir. 2007).

## Conclusion

The ALJ failed to properly evaluate Plaintiff's credibility, which resulted in

---

[10] Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause. This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

an improper analysis of opinion evidence and an RFC determination that was not supported by substantial evidence on the record as a whole. The matter will therefore be remanded for further consideration. Although the Court is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 18th day of March, 2014.